53 CCPA

**Application of James G. BURT and Henry C. Walter.**

**Patent Appeal No. 7493.**

United States Court of Customs and Patent Appeals.

Feb. 24, 1966.

**116**

Robert C. Kline, Wilmington, Del. (Frederick Schafer, Washington, D. C., of counsel), for appellants.

Clarence W. Moore, Washington, D. C. (Jack E. Armore, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

WORLEY, Chief Judge.

This appeal is from the decision of the Board of Appeals which affirmed the examiner's rejection of the claims in appellants' application[1] for "Polyether Polymers."

Claims 1 and 11 are representative:

1. A millable, sulfur-curable polyalkyleneether polymer having a molecular weight of at least about 30,000 and consisting essentially of the recurring units —(—G–O—)— wherein G is a radical selected from the group consisting of an alkylene radical and a substituted alkylene radical wherein the substituents are free of any Zerewitinoff active hydrogen atoms and have a molecular weight of not greater than about 250, with the proviso that at least about one-third of the G's be tetramethylene radicals and that there be an average of at least one G for every 10,000 units of molecular weight of polymer, having a side chain which contains a non-aromatic, carbon-to-carbon unsaturated group, said side chain having a molecular weight of not greater than about 250.

11. A process for the preparation of a millable, sulfur-curable polyalkyleneether polymer having a molecular weight of at least about 30,000 which comprises reacting tetrahydrofuran with a compound selected from the group consisting of oxetanes, oxiranes and mixtures of both, in the presence of from 0.005 to 0.5 mol per cent of cationic polymerization catalyst based on the mols of cyclic ethers employed and at a temperature of from about −80 to 70° C., and recovering the resulting polyalkyleneether polymer; with the proviso that at least 33⅓ mol per cent of said reactants be tetrahydrofuran and that at least one of said oxetanes or oxiranes have a side chain containing non-aromatic, carbon-to-carbon unsaturation so as to provide at least one of said side chains for every 10,000 units of molecular weight of polymer, said side chain having a molecular weight of not greater than about 250.

As evident from those claims, the application is directed to millable, sulfur-curable polyalkyleneether polymers which have side chains containing non-aromatic carbon-to-carbon unsaturated groups, and which have a minimum molecular weight of 30,000. The presence of at least one such side chain for each 10,000 units of molecular weight of the polymer permits curing or vulcanization of the polymer by sulfur according to well known procedures.

The polymers are prepared by polymerization of selected mixtures of substituted and unsubstituted cyclic ethers in the presence of a cationic catalyst at

1. Serial No. 713,538, filed February 6, 1958. Claims 1–3, 5–7, 9, 11, 12 and 14 are on appeal.

temperatures of −80° to 70° C. At least 33⅓ mol percent of the polymerizable reactants must invariably consist of unsubstituted tetrahydrofuran, a five-membered cyclic ether also known as tetramethylene oxide or 1,4-epoxybutane. The remaining cyclic ether reactants may be chosen from substituted or unsubstituted oxiranes (a three-membered cyclic ether also known as ethylene oxide or epoxide) and oxetanes (a four-membered cyclic ether also known as 1,3-propylene oxide or oxacyclobutane). While the substituted oxiranes or oxetanes utilized may contain a wide variety of side chain radicals free of active hydrogen atoms, sufficient amounts of those cyclic ethers which contain a carbon-to-carbon unsaturated group, $-\overset{|}{C}=\overset{|}{C}-$, to yield the requisite number of sulfur curing sites must be employed. The cationic catalysts appellants utilize are of the Friedel-Craft type, such as phosphorous pentafluoride, antimony pentachloride and boron trifluoride. The products recovered after polymerization are described as soft, rubbery polymers.

The references are:

Pattison      2,808,391      October   1, 1957.
German Patent    914,438      July      1, 1954.

Pattison discloses certain elastomeric polyurethane polymers having side chains containing aliphatic $-\overset{|}{C}=\overset{|}{C}-$ groups. The side chains, occurring at least once for every 8,000 units of molecular weight of the polyurethanes, serve as potential curing sites and the polymer subsequently may be cured utilizing conventional sulfur curing procedures known to the rubber industry. In general, Pattison prepares his polyurethane polymers by reacting a polyalkleneether glycol, an organic diisocyanate and a low molecular weight, nonpolymeric glycol (a chain extending agent), one or more of which contain an aliphatic carbon-to-carbon unsaturated group as a side chain. The following disclosure with respect to the nature of the polyalkyleneether glycols contemplated by Pattison is pertinent:

When preparing the polymers of the present invention by the reaction of glycols with diisocyanates, various high molecular weight, polymeric glycols, such as polyalkyleneether glycols, * * * may be used. *These polymeric glycols should have molecular weights of at least 750; however, they may be as high as about 10,000.* In general, molecular weights of 750 to 5000 are preferred. It is to be understood that any of these polymeric glycols may have side chains containing aliphatic

$$-\overset{|}{C}=\overset{|}{C}-\text{groups}$$

and when they do, the molecular weights will be increased in accordance with the molecular weights of the side chain groups.

In general, the polyalkyleneether glycols are preferred. These compounds may be represented by the formula $HO(GO)_nH$, wherein G is an alkylene radical and *n* is an integer sufficiently large that the polyalkyleneether glycol has a molecular weight of at least 750. Not all of the alkylene radicals present need be the same. These compounds are ordinarily derived by the polymerization of cyclic ethers such as alkyleneoxides or dioxolane or by the condensation of glycols. The preferred polyalkyleneether glycol is polytetramethyleneether glycol, also known as polybutyleneether glycol. Polyethyleneether glycol, polypropyleneether glycol, 1,2-polydimethylethyleneether glycol and polydecamethyleneether glycol are other typical representatives of this class. *Polyalkyleneether glycols having side chains which contain aliphatic C=C groups may be prepared by copolymerizing tetrahydrofuran with butadiene monooxide*[2] *as more particularly*

---

**2.** That particular polyalkyleneether glycol would contain "G" units, as set forth in Pattison's formula, consisting of tetramethylene radicals ($-CH_2CH_2CH_2CH_2-$)

and radicals derived from 1,2–butadiene monooxide ($-CH_2-\overset{|}{C}H-$).

$$\overset{|}{C}H=CH_2$$

*described in German Patent No. 914,438.* [Emphasis supplied.]

The German patent, which has been incorporated by reference into the disclosure of Pattison, is directed to preparation of tetrahydrofuran polymerization products. Those products are obtained by copolymerizing certain 1,2-epoxy compounds, such as ethylene oxide or epichlorohydrin, with tetrahydrofuran in the presence of various cationic polymerization catalysts of the Friedel-Craft variety, such as boron trifluoride or antimony pentachloride. The resultant products obtained from the copolymerization of tetrahydrofuran and mono-epoxides are described as viscous, oily liquids.

In initially rejecting the claims as unpatentable over Pattison alone, the examiner stated:

> * * * This reference discloses polyethers made by reacting tetrahydrofuran with an oxirane or an oxetane. * * * Although Pattison 2,808,391 does not disclose polyethers of molecular weight 30,000 it would be obvious to one skilled in the art to increase the molecular weight.

In subsequent correspondence with appellants, it was the examiner's position that Pattison disclosed many material features of the claimed subject matter. As for the limitations not disclosed, he said:

> * * * The instant claims call for nothing more than a polyalkylene-ether polymer having a molecular weight of 30,000 and having side chains with carbon-to-carbon unsaturation. This polymer, except for the molecular weight, is disclosed in Pattison. The term "millable, sulfur-curable" does not change the fact that the polymer is a polyalkyleneether. It is deemed that the difference in molecular weight between the instant polymer and the Pattison polymer is one of degree and not of kind. * * *

Up to that point, the examiner did not specially treat the subject matter of process claims 11, 12 and 14, or point out to appellants wherein the specific limitations therein were disclosed by, or obvious from, Pattison alone. However, in his answer to appellants' brief before the board, the examiner noted that Pattison incorporated German by reference, stating:

> * * * The German reference is relied on to show the particular *reaction conditions* of applicants' method claims which are (1) proportions of reactants, (2) catalyst and (3) temperature. The particular reactants are shown by Pattison.

Developing his position further, the examiner said:

> * * * the instant claims on appeal are directed to a "millable, sulfur curable" polyalkylene-ether polymer. The Examiner regards this preamble phrase as a mere statement of intention or desired result and further it fails to recite positive action steps. Consequently it is given little weight and certainly patentability could not be predicated upon this preamble clause.

> Now to the principal issue of whether the 30,000 M.W. polymer is patentable over a 10,000 M.W. polymer of the same composition. * * * As a matter of background it is considered a general rule in polymer chemistry that a high molecular weight solid polymer is patentable over the same low molecular weight viscous or liquid polymer. Likewise a 50,000 or more molecular weight *solid* polymer may be patentable over a 1,000–5,000 molecular weight solid polymer. The rationale is presumably that a radical departure from the prior art in process and/or utility sustains the patentability. * * * In the instant case the difference is 10,000 v. 30,000. When considering the patentability of like compositions of matter differing in molecular weight, some of the tests of patentability applied by the Examiner are (1) the history of the art; was there difficulty encountered by prior workers in obtaining a high molecular weight polymer now being

claimed? and (2) comparison of the process steps of the reference with applicants' process steps. In considering a history of the art approach, nothing in Pattison suggests that polyalkylene-ether polymers of *over* 10,000 M.W. are impossible to prepare. * * * Additionally the applicants have submitted no argument or exhibit showing the impossibility of preparing the 30,000 M.W. polymer prior to applicants' alleged invention.

Primary reliance was placed on a comparison of appellants' and German's process steps to demonstrate obviousness of the claimed process and product. The examiner found appellants' particular reactants, amounts of reactants, catalyst materials and temperature ranges all disclosed by German or Pattison, and noted he could

* * * find no process step or a reaction condition in method claims 11, 12 and 14 not taught by the German patent and this evidence is given substantial weight in finding a lack of unobviousness in the product claims.

It appears that Pattison desired to halt the polymerization at a certain molecular weight so that a diisocyanate could be added, therefore it is probable that a longer reaction time would produce a higher molecular weight polymer. However this is not relied on as conclusive in finally determining patentability.

In its decision, the board said:

* * * no general rules can be drawn as to the relationship between numerical differences in molecular weight of polymeric materials and the patentability of claims manifesting a different molecular weight from a prior art polymer. It is apparent that mere novelty, as indicated by a failure of the prior art to expressly refer to polymers of a specific average molecular weight, does not establish by itself that a polymer is unobvious from the prior

art. In determining whether a particular polymer is obvious it is proper to consider such facts as the polymer's manner of preparation and the presence or absence of properties which would have been unexpected from the prior art.

The board regarded an affidavit submitted by appellants to provide "dubious evidence" of their contention that polyalkyleneether glycols of 10,000 molecular weight and having unsaturated side chains are not millable or sulfur-curable. In addition, it noted the term "millable" in the claims is not limited to any certain degree of difficulty.

As to the process claims, the board agreed with the examiner that the German patent indicates "preparation of polyalkyleneether glycols presented no technical problem" and that there is nothing to suggest that the claimed process "involves a substantial or unobvious departure" from that suggested by the reference combination.

■ We have quoted extensively from the opinions of the examiner and board in order to present a clear picture of their reasoning. We agree with their general approach to the problem, and think that it is appropriate in determining obviousness of a composition to consider, inter alia, such matters as (1) the manner of preparation of the composition vis a vis the prior art, (2) the structural similarities as well as differences between the claimed composition and that of the prior art, and (3) the presence or absence of properties which would be unobvious in view of the prior art. Necessarily such a comparison as is involved in (1) will also be helpful in determining the patentability of the process for preparing the product. We disagree, however, with the conclusion of obviousness derived from the facts shown by this record.

### The Process Claims

While both the examiner and board recognized that the respective processes carried out by the prior art and appel-

lants produced products of different molecular weight, viz, appellants' average polymer chain was three times heavier (or longer) than Pattison's or German's, they shared the view that few, if any, of the process steps and limitations were not shown by those references. Thus Pattison was found to disclose that polyalkyleneether glycols of less than 10,000 molecular weight, and containing unsaturated side chains, could be prepared by reacting tetrahydrofuran and butadiene monooxide (a substituted oxirane within the scope of the claims). Pattison referred to German for a disclosure of how to prepare that product. German, in turn, was found to suggest appellants' temperature range, cationic catalyst materials, and ratios of tetrahydrofuran and substituted oxirane or oxetane reactants. We agree with those findings of fact and accept them as far as they go. However, as the examiner acknowledged, "a higher molecular weight polymer obtained from the same reactants used to prepare the lower molecular weight polymer must certainly involve changes in process conditions, if any changes do occur." What, then, are the changes over the prior art which enable appellants to prepare a polymer of greater than 30,000 molecular weight?

At this point it is appropriate to review what appellants' specification says with regard to the process conditions necessary to prepare a polyalkyleneether polymer of 30,000 molecular weight:

When preparing these polyether polymers, the extent of polymerization as reflected by the inherent viscosity of the polymer depends upon the temperature at which polymerization is effected and the particular catalyst used and its concentrations. In general, the lower the concentration of the catalyst, the higher the molecular weight of the resulting polyether polymer. Also, when the reaction temperature is higher, the molecular weight of the resulting polyether polymer will be lower. * * *

* * * * * *

The catalyst concentration should be in the range of 0.005 to 0.5 mol per cent, based on the total mols of cyclic ethers to be polymerized. * * * The inherent viscosities of the polymers prepared at relatively high catalyst concentrations tend to lower values than desired.

* * * * * *

* * * The soluble polymers of this invention have inherent viscosities of at least 1.0, when determined on 0.1% solutions in benzene at 30° C. These inherent viscosities correspond to molecular weights of at least about 30,000. Polymers having lower inherent viscosities tend to be too soft and sticky, and thus are difficult to mill and process in conventional equipment. All the polyether polymers of this invention are millable and processable in conventional equipment of the rubber industry * * *.

Appellants challenge the examiner's statement that there was "no process step or a reaction condition in method claims 11, 12 and 14 not taught by the German patent," as well as the board's finding that the temperature and catalyst concentrations recited in appellants' claims were not "critically distinct from temperatures and catalyst concentrations of the German patent." While we agree with the examiner and board that the temperature range of −80° C to 70° C recited in the claims is amply disclosed by German, we must also agree with appellants that nowhere in German or in Pattison is there any disclosure of the quantity of catalyst required to produce a polyalkyleneether polymer of 30,000 molecular weight.[3] Nor did the examiner or board find as a fact that one of ordinary skill in the art would expect from his knowledge of analogous cationic polymerization reactions and kinetics in gen-

3. In the relevant examples of German, catalyst concentrations of about 0.65% to 1.0% (in mol% based on total mols of cyclic ether) are employed to produce oily liquid polymerization products.

eral that utilization of a lower concentration of catalyst in the present process would produce a substantially higher molecular weight product than either German or Pattison were able to produce. We think appellants' specification makes it abundantly clear that the claimed catalyst concentration is necessary to produce their particular polymer product. While the German patent may suggest that preparation of polyalkyleneether glycols of 10,000 molecular weight presents no "technical problem," we fail to find a suggestion therein that appellants' claimed process involves merely an obvious departure from the prior art. There being insufficient evidence in the record as a whole to sustain the board's conclusion as to obviousness of appellants' process, its decision is reversed.

### The Composition of Matter Claims

The issue here is whether millable, sulfur-curable polyalkyleneether polymers having a minimum molecular weight of 30,000 are patentable over the prior art which discloses a similar polyalkyleneether having a molecular weight no greater than 10,000 and is silent as to the "millable" and "sulfur-curable" properties of that material. In resolving that issue, we shall consider, seriatim: (1) whether the prior art suggests that the particular polyalkyleneether polymers of claim 1 which have a molecular weight of 30,000 may be prepared by *any* particular method, (2) whether the prior art suggests the particular structure of those polymers, and (3) whether the prior art suggests the particular properties possessed by those polymers.

We have already found appellants' particular process for producing their polymers unobvious in view of Pattison and German. The question remains whether those references suggest that appellants' polymers may be produced by other methods.

The examiner thought it probable that employment of a longer reaction time in the process disclosed by Pattison and German would produce a higher molecular weight polymer. The board did not comment on that contention. We think the record contradicts the examiner's position, since a comparison of the specific examples in appellants' specification and in German shows that comparable reaction times of the order of 24 hours were utilized by both parties.[4] It would seem that something more than mere time governs the molecular weight of the polymer produced by the respective processes.

The examiner noted that "nothing in Pattison suggests that polyalkylene-ether polymers of *over* 10,000 M.W. are impossible to prepare" and that appellants had "submitted no argument or exhibit showing the impossibility of preparing the 30,000 M.W. polymer" prior to appellants' invention. While those observations are undoubtedly true, we might add that neither do the references suggest that those polymers can be prepared. Silence in a reference is hardly a proper substitute for an adequate disclosure of facts from which a conclusion of obviousness may justifiably follow.

Turning to the structure of the instant polymer, we agree with the Patent Office that the nature of "G" in the repeating unit +G–O+ as defined in product claim 1 is rendered obvious by Pattison in view of German. We cannot agree, however,

---

4. The record demonstrates that the polymerization process disclosed by German proceeds by way of a ring scission of the cyclic ether reactants to form carbonium or oxonium ions. The formation of the polymer chain through an ionic mechanism proceeds in a manner akin in a kinetic sense to typical *addition* or chain-reaction polymerizations. The passage of time in addition polymerization affects ultimate yield, but generally has little effect on the degree of polymerization (molecular weight). In *condensation* or step-reaction polymerizations, on the other hand, longer reaction times generally will provide higher molecular weight polymer products. While we note that Pattison does disclose that his polyalkyleneether glycols may be prepared by condensation of suitable glycols with consequent splitting off of water, it is apparent that neither the examiner nor the board relied on that disclosure as a basis for their rejection.

that those references suggest a polymer structure which is three times the weight or length disclosed by Pattison as the maximum desirable for use in preparing his particular polyurethane polymers. We question whether one of ordinary skill in the art, upon reading Pattison and German, would be apprised of the desirability of a heavier or longer polymer chain length.

Finally, appellants argue that their polymers have the properties of being "millable" and "sulfur-curable," and that those properties are not possessed by the Pattison polyalkyleneether glycol polymers of lower molecular weight. Although we share the view of the board that one of ordinary skill would expect the Pattison polymeric glycols to be "sulfur-curable," i. e. react with sulfur, because of the presence of unsaturated $-\overset{|}{C}=\overset{|}{C}-$ groups in the side chains, we are unwilling to conclude that the oily, viscous liquid polymers of Pattison or German, having a molecular weight of less than 10,000, are indeed "millable" in the sense intended by appellants. Appellants' specification makes it clear that polymers having a lower molecular weight than 30,000 tend to be "too soft and sticky" to be millable in conventional equipment. We regard appellants' affidavit, to the effect that cerain copolymers having the repeating unit structure set forth in the claims and having a molecular weight of 10,000 were "too fluid to be handled on a rubber mill," as corroboration of the disclosure in their specification. We think the record supports appellants' contention that the term "millable" applied to the present polymers is an expression which, when considered with the associated molecular weight of the material, is a significant property difference demonstrating lack of obviousness over the prior art.

When all the foregoing factors are considered, we are satisfied that a conclusion of obviousness of the claimed products is also without sufficient foundation in the record. The decision is reversed.

Reversed.